CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

NOAH STERN (CABN 297476)
Assistant United States Attorney

     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102-3495
     Telephone: (415) 436-6758
     FAX: (415) 436-7234
     Noah.Stern@usdoj.gov

Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. CR 25-00023 YGR |
| Plaintiff, | ) **GOVERNMENT'S SENTENCING** |
| | ) **MEMORANDUM** |
| v. | ) |
| | ) Sentencing Date: April 16, 2026 |
| ERIC REGO, | ) Time:            3:00 p.m. |
| | ) Judge:          Hon. Yvonne Gonzalez Rogers |
| Defendant. | ) |
| | ) |

## I.    INTRODUCTION

Eric Rego defrauded Mt. Diablo Unified School District ("MDUSD") of over $3 million dollars from 2020 to 2024.  Rego, an employee of MDUSD, managed the after-school program meant to serve low-income students and had authority to approve the invoices of the contractor who operated the program.  Instead of doing his job and ensuring that students received the best services for the money spent by the contractor, Rego used his position to have the contractor send him over $3 million in iPads and other devices, which he then sold to pay gambling debts.  Rego then directed the contractor to invoice the amounts to MDUSD—hiding it in a "subcontracts" line-item—and ensured that MDUSD paid the invoices.  The Court should sentence Rego to 33 months prison, a three year term of supervised

GOV'T SENTENCING MEM.                                    1
CR 25-00023 YGR

release (with the conditions recommended in the PSR), a $100 special assessment, and order restitution in the amount of $3,638,250.

## II.    BACKGROUND

### A.    Rego Defrauds Mt. Diablo Unified School District

For an almost four year period, Rego executed a fraud scheme to defraud Mt. Diablo Unified School District ("MDUSD") of millions of dollars earmarked for MDUSD's CARES expanded learning program, a program intended for low-income or high-needs students. Presentence Investigation Report ("PSR") ¶¶ 7-10.[1] To do so, Rego abused his position as MDUSD's CARES program coordinator, a role in which he was responsible for working closely with the contractor that MDUSD used to operate the CARES program. PSR ¶ 8-9. In his role, Rego was responsible for renegotiating MDUSD's contract with the contractor prior to each school year. *Id.* ¶ 9. He was also responsible for approving all monthly invoices the contractor submitted to MDUSD. *Id.* Prior to his employment at MDUSD, Rego had been an employee of the contractor and responsible for the contractor's operation of CARES at various MDUSD after-school sites. *Id.*

Rego's scheme involved causing the contractor to purchase iPads, MacBooks, GoPro cameras, and other technology that were shipped to Rego's home. *Id.* ¶¶ 10-15. Rego did so in two ways. First, Rego directed an employee of the contractor Redacted to order devices on the contractor's credit card (Rego also used the contractor's credit cards himself to purchase devices). *Id.* ¶ 11, 29-30. Second, Rego directed a different employee of the contractor to order devices using the contractor's corporate accounts with retailers, telling the employee that the devices were needed for students enrolled in the CARES program. *Id.* ¶ 12. However, after receiving the devices,

---

[1] According to MDUSD's CARES student handbook, CARES is primarily funded through grants from the California Department of Education – After School Safety and Education Grants, which serve high-need population areas and provide academic, enrichment, recreational, and health support five days a week, 2.5 hours a day throughout the school year and intersession. *See* Parent Handbook, Mt. Diablo Unified School District CARES Expanded Learning Program, at 7, *available at* https://resources.finalsite.net/images/v1775313827/mdusdorg/gdu4d0mwykwt5te7d6es/24-25ParentHandbookENGLISHdocx1.pdf (last visited Apr. 9, 2026). Highest priority for participation in the program is given to students who are homeless or foster youth, multilingual learners, and income eligible for free/reduced lunch. *Id.* According to CARES website, 86% of CARES students qualify for free and reduced lunch. *See* Our Program & Schools, CARES Expanded Learning Program, *available at* https://cares.mdusd.org/our-school (last visited Apr. 9, 2026).

Rego sold them and pocketed the proceeds, while causing the contractor to invoice MDUSD for the cost of the devices. *Id.*

Rego attempted to conceal the fact that devices were shipped to his home address by redacting receipts before they were submitted to the contractor's accounting function at the end of each month. *Id.* ¶ 14. Rego directed the contractor to include the costs of the devices in the invoices that the contractor submitted to MDUSD. *Id.* ¶ 15. Specifically, Rego directed the contractor to include the expenses in the "Subcontracts" or "Subcontracts/Supplies" line-item. ¶ 15. Rego then approved these invoices and submitted them to MDUSD's fiscal department for payment, representing that the amounts were for expenses the contractor incurred from operating the CARES program. *Id.* ¶ 16-18.

Early in the fraud scheme, in September 2020, a MDUSD fiscal analyst that Rego supervised questioned the subcontracts line-item and asked for additional details about what it included. *Id.* ¶ 19. Rego responded that the invoice could be processed without "all that makeup" and it was "easier that way." *Id.* Unsatisfied with Rego's answer, the employee responded that if the invoice had to go through her hands, she wanted to know more detail: "a completely unsubstantiated $59,000 expense is no small thing." *Id.* In response, Rego said he would "just take care of it" and instructed the employee to leave the invoice on his desk. *Id.*

In the months following this exchange, Rego caused MDUSD to initiate disciplinary proceedings against the employee who had questioned the "subcontracts" expense in order to intimidate the employee and ensure that he could continue his fraud scheme. *Id.* ¶ 20. Despite fearing termination, in around May 2022, the employee emailed Rego's supervisor to request that a provision be added to the contractor's contract requiring the contractor to provide documentation supporting its monthly invoices. Rego responded by questioning whether the change would be possible "as these are how their invoices have always been done/paid so I don't foresee adding the language." *Id.* ¶ 21. Rego also wrote that they could have a conversation about the topic again for the 2023-2024 contract. *Id.* No changes were made to the contract and Rego was able to continue his scheme until May 2024. *Id.* & ¶ 10. Rego sold the devices that were shipped to his house at a fraction of the cost and used the proceeds to pay gambling debts. *Id.* ¶¶ 12-13.

In total, Rego defrauded MDUSD of at least $3,465,000 in connection with devices that were shipped to his house.  *Id.* ¶ 24; Dkt. No. 33 ¶ 2 (Plea Agreement).

**B.      Victim Impact**

MDUSD submitted a victim impact statement, which has been provided to the Court.  PSR ¶ 44. According to the victim impact statement, Rego's fraud resulted in the district paying for expenses that were not for the students' benefit.  *Id.*  Funds flowed to purchase Rego devices rather than being used to fund educational enrichment such as fine arts, career technical education, recreation, physical fitness, literacy coaches, high-dosage tutors, school counselors, and instructional day teachers and aides to assist pupils.  Rego's fraud also caused MDUSD to terminate its contract with the contractor and find a new provider for the CARES program, which cost MDUSD resources and significant staff time.  According to MDUSD, the termination of the contractor resulted in student attendance dropping, which resulted in lost funding.

**C.      Procedural History**

On January 30, 2025, a federal grand jury returned an Indictment against Rego, charging him with three counts of mail fraud in violation of 18 U.S.C. § 1341.  Dkt. No. 1.  On February 4, 2025, Rego was arrested in the Eastern District of California.  Dkt. No. 7.  At a Rule 5 initial appearance on February 5, 2025, Rego was ordered released on his own recognizance.  *Id.*  On February 7, 2025, Rego appeared in the Northern District of California and entered a not guilty plea.  Dkt. No. 8.

On November 3, 2025, Rego pleaded guilty to Count 3 pursuant to a written plea agreement. Dkt. No. 33.  In the plea agreement, the government agreed to recommend a sentence of no more than the low-end of the applicable sentencing guidelines range.  *Id.* at ¶ 16.  Rego agreed to pay full restitution for all losses caused by his fraud scheme.  *Id.* ¶ 9.

**III.    SENTENCING GUIDELINES CALCULATIONS**

As set forth in the PSR and agreed in the plea agreement, the Sentencing Guidelines calculation for Rego's offense level is as follows:

a.      Base Offense Level, U.S.S.G. § 2B1.1(a)(1):                                                7

b.      Specific Offense Characteristics, U.S.S.G. §2B1.1(b)(1)(I)                       +16
        (Loss greater than $1.5 million but less than $3.5 million)

c.      Adjustment for Role in the Offense, U.S.S.G. § 3B1.3          +2
         (Abuse of Position of Trust)

d.      Acceptance of Responsibility, U.S.S.G. §3E1.1                 -3

e.      Adjustment for Certain Zero-Point Offenders, U.S.S.G.§ 4C1.1  -2

f.      Total Offense Level:                                          20

*See* PSR ¶¶ 49-58; Dkt. No. 33¶ 7.

The Probation Officer concluded that Rego has no criminal history, and he therefore falls into Criminal History Category I.  PSR ¶ 63.  As reflected in the PSR, the Guidelines range for imprisonment associated with total offense level 20 and Criminal History Category I is 33 to 41 months.  *Id.* ¶ 106.

## IV.     SENTENCING RECOMMENDATION

### A.     Legal Standard

The United States Sentencing Guidelines serve as "the starting point and initial benchmark" of any sentencing process and are to be kept in mind throughout the process.  *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007).  The overarching goal of sentencing, as set forth by Congress, is for the Court is to "impose a sentence sufficient, but not greater than necessary."  *Carty*, 520 F.3d at 991.  In accomplishing that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a), including:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3)     the need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### B.     The Court Should Sentence Rego to 33 Months Prison

The government recommends that the Court sentence Rego to 33 months in prison, the low end of the guidelines range.  A 33-month sentence is supported by the need for the sentence imposed to

GOV'T SENTENCING MEM.                          5
CR 25-00023 YGR

reflect the seriousness of the offense and promote general deterrence, while also accounting for the fact that Rego has no criminal history and has fully accepted responsibility for his crime.

It is hard to overstate the seriousness of Rego's offense. Rego stole from a program designed to serve low-income public-school students. Money that could have been used for enrichment programs for students was instead stolen by Rego to pay his gambling debts. The calculated decision Rego made was egregious. As were his efforts to ensure that he could continue his fraud. When challenged by a subordinate employee, rather than give up his fraud scheme, he doubled down and subjected the employee to disciplinary action so she would no longer challenge his authority to approve invoices without oversight. Rego was able to use his power and his position of trust to continue his scheme for almost four years, defrauding MDUSD of over $3.4 million.

General deterrence is also particularly important in this case. It must be made clear to people who are entrusted with public funds—particularly those who control public funds used for educating our children—that there are significant consequences for abusing that trust. It is not always possible to create internal systems of checks and balances to prevent all fraud and embezzlement, and doing so may result in more public funds being directed to bureaucratic systems of safeguards rather than directly benefiting students. It must be clear to individuals who are entrusted with control of government funds earmarked for public benefit that they will face severe punishment if they abuse that position and use it instead to enrich themselves.

The Court should also consider the fact that this is Rego's first criminal offense, that he has accepted full responsibility, and that he has made a restitution payment. Absent those factors the government would be recommending a higher sentence. The Court, however, should not vary downward. While Rego presents significant information regarding his background and challenges he has faced in his life, Rego had a relatively privileged upbringing compared to many, if not most, of the criminal defendants that come before this Court. The Court should impose a 33-month sentence.

For the same reasons, a three-year term of supervised release following a custodial sentence is appropriate in this case with the conditions recommended in the PSR and agreed to in the plea agreement.

## V.    RESTITUTION

In his plea agreement, Rego admitted that he fraudulently obtained from MDUSD not less than $3,465,000.  Dkt. No. 33 at ¶ 2.  Rego also agreed to pay restitution in an amount of no less than $3,465,000.  *Id.* ¶ 9.  In its victim impact statement, MDUSD asserts total losses of $4,583,877.02, which the government understands to be the total amount invoiced by the non-profit in the "sub-contractors/supplies" category plus a 5% processing fee that the contractor charged on all amounts invoiced.  Rego has asserted that the "sub-contractors/supplies" category also included legitimate expenses used in support of the CARES program.  Through its review of records obtained during the course of the investigation, the government has only been able to attribute $3,465,000 of the subcontracts category to Rego's fraud.  The government, however, believes that the 5% processing fee on this amount should also be recoverable to MDUSD as restitution ($173,250).  Therefore, the government requests the Court order restitution in the amount of $3,638,250.  The government understands that Rego does not contest this amount.

## VI.    CONCLUSION

For the foregoing reasons, the government recommends that the Court sentence Rego to 33 months in prison, a three-year term of supervised release (with the conditions set forth in the PSR), and a $100 special assessment.  The Court should also order Rego to pay restitution in the amount of $3,638,250.

DATED:  April 9, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney


 */s/ Noah Stern*
NOAH STERN
Assistant United States Attorney